**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AUGUSTIN TORRES GONZALEZ,**

                     **Plaintiff,**

**v.**                                      **3:17-CV-373 (NAM/ML)**

**STEVEN HAHL,**

                     **Defendant.**

_____

**Appearances:**

Jonathan S. Follender, Esq.
P.O. Box 511
42838 NYS Route 28
Arkville, New York 12406
_Attorney for Plaintiff_

Andrew W. Koster, Esq.
Assistant Attorney General
Office of the New York State Attorney General
The Capitol
Albany, New York 12224
_Attorney for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

       Plaintiff Augustin Torres Gonzalez brings this action under 42 U.S.C. § 1983, the U.S.

Constitution, and the Constitution of New York State, asserting claims against Defendant

Steven Hahl for false arrest and malicious prosecution.  (Dkt. No. 41).  Now before the Court is

Defendant's motion for summary judgment, (Dkt. Nos. 72, 84), and Plaintiff's papers in

opposition, (Dkt. No. 79).  For the reasons that follow, Defendant's motion is granted.

## II.  BACKGROUND[1]

In December 2015 Plaintiff shared a home with his brother, his sister, and both of their families.  (Dkt. No. 85, ¶¶ 1–2).  Plaintiff's sister's daughter, I.T., was six years old at the time and attending first grade at Margaretville Central School.  (*Id.*, ¶ 3).

On December 17, 2015, Delaware County Department of Social Services ("DSS") caseworker Cynthia Bogdan-Cumpston ("Cumpston") was assigned to investigate a report from a classroom teacher that I.T. was being left home alone with her 12-year-old brother, who was hitting her.  (*Id.*, ¶ 4).  Cumpston went to the school to interview I.T. about the reported abuse.  (*Id.*, ¶ 5).  The School Guidance Counselor, Nancy Millen ("Millen"), brought I.T. to her office and Cumpston interviewed I.T. there.  (*Id.*, ¶¶ 6–7).

During the interview, Cumpston asked I.T. questions about her living situation, including questions about whether there were drugs and alcohol in the home, and if she experienced any physical abuse.  (Dkt. No. 72-4, p. 4).  With regard to I.T.'s allegations of sexual abuse, Cumpston's interview notes state the following:

> [Cumpston] asked [I.T.] if anyone has touched her private parts.  I.T. stated that her uncle has touched her private parts.  [Cumpston] asked what her uncle's name is and I.T. stated she doesn't know she just calls him uncle.  [Cumpston] asked if she can remember when her uncle touched her private parts.  I.T. stated that her uncle touched her private parts when she went into kindergarten.  [Cumpston] asked if she can remember how many times her uncle touched her private parts.  I.T. stated that her uncle touched her more than one time but she doesn't remember how many times.  [Cumpston] asked who was home when her uncle touched her private parts.  I.T. stated that just she and her uncle were at home when he touched her private parts.  [Cumpston] asked if her uncle asked her to touch his private parts and stated that he did not.  I.T. stated that she never told anyone that her uncle touched her private parts.  [Cumpston] asked which of her private parts her uncle touched.  I.T. began looking up at the

[1] The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 72-2), Plaintiff's response and counterstatement of material facts, (Dkt. No. 78), Defendant's response (Dkt. No. 85), and the parties' attached exhibits, depositions, and declarations (*see generally* Dkt. Nos. 72, 77–85).

ceiling and ignoring [Cumpston's] question. [Cumpston] was given two hand puppets by Nancy [Millen], one was a female the other was a male. [Cumpston] explained that girls have three different areas that are private areas that nobody is supposed to touch. [Cumpston] pointed to the chest of the female puppet and showed I.T. as this being one of the areas that nobody is supposed to touch. [Cumpston] then pointed to the area of the puppet that would be the vagina as another private area that nobody should touch, and then [Cumpston] turned the puppet over and pointed to the buttock area on the puppet and told I.T. that this is the third place on the body that nobody is supposed to touch. [Cumpston] gave the hand puppets to I.T. and asked her if she could show [Cumpston] where her uncle touched her. I.T. began playing with the puppets however she was not showing [Cumpston] what had happened to her but was just merely clapping her hands together while holding the puppets and was ignoring [Cumpston]. [Cumpston] asked if her uncle is still touching her private parts now and I.T. shook her head indicating no.

(*Id.*, pp. 4–5). After the interview, Cumpston contacted her supervisor at DSS, who instructed her to call the State Police "to find out if they would like to do the investigation along with [Cumpston]." (*Id.*, p. 5).

Defendant, a Senior Investigator with the New York State Police, responded to the school along with Investigator Brian Dengler and Trooper James Adams. (Dkt. No. 78, ¶ 15). Cumpston explained to the officers that "I.T. had disclosed that her uncle touched her private parts," and asked if they would like to accompany her in a follow-up interview with I.T. about the alleged sex abuse. (Dkt. No. 72-4, p. 5). According to Defendant, he tried to interview I.T., but "she would not make any disclosures to me relative to sexual abuse." (Dkt. No. 72-3, ¶ 5). Cumpston suggested that Defendant and his colleagues leave the room, and she then conducted the interview. (*Id.*).

During this interview, I.T. confirmed her earlier statements that Plaintiff "touched her private part on more than one time." (Dkt. No. 72-4, p. 8). When Cumpston asked I.T. which "private part" her uncle touched, I.T. indicated that he had touched her groin area. (*Id.*). I.T.

stated that she told her uncle to stop, but he "said no and kept touching her private part." (*Id.*). I.T. also stated that Plaintiff touched her "on the outside of her pants." (*Id.*). Based on that information, the investigators decided that they needed to conduct a home visit to "assess the home for safety and for police to speak with [Plaintiff]." (*Id.*, p. 9).

When the investigators arrived at the home, Cumpston and Trooper Adams went inside to conduct a safety assessment, while Defendant and Investigator Dengler asked to speak with Plaintiff outside. (Dkt. No. 72-4, p. 9). Defendant and Investigator Dengler then asked Plaintiff to go with them to the police barracks for an interview. (Dkt. No. 85, ¶¶ 29–30). Plaintiff agreed and traveled to the barracks alone in his own vehicle. (Dkt. No. 72-3, ¶ 7).

At the barracks, Defendant told Plaintiff that the purpose of the interview was to follow up on an anonymous report that I.T. and her brother were often left at home by themselves. (Dkt. No. 83-6, p. 2). When Defendant read Plaintiff his *Miranda* warnings, Defendant had not yet informed Plaintiff that he would also be asking about I.T.'s allegations that Plaintiff touched her inappropriately. (*Id.*, pp. 10–11; Dkt. No. 85, ¶ 107). After issuing the *Miranda* warnings, Defendant informed Plaintiff that I.T. told social workers that he had touched her inappropriately on more than one occasion. (Dkt. No. 83-6, pp. 21–22). Defendant denied any inappropriate touching, and stated that "I'm not the type of person to do that kind of stuff with kids because . . . we teach kids good stuff. Not that kind of stuff. So I don't do anything wrong to them." (*Id.*, p. 22).

As the interview progressed, Defendant asked Plaintiff whether he could recall any time when he may have touched I.T. inappropriately. (*See id.*, pp. 26–29). In response, Plaintiff stated that he has only ever hugged her, and on occasion, has accidentally touched her leg, at which point he claimed that he immediately apologized. (*Id.*, p. 28). Plaintiff went on to

describe a situation where I.T. was sitting on his lap while he worked on the computer.  (*Id.*, pp. 30–32).  Plaintiff claimed that I.T. "almost fall [sic] like a few times and I tried to hold her, you know, in order not [to fall]."  (*Id.*, pp. 31–32).  I.T. told him to stop touching her, at which point he told her "I was trying to hold you and I'm sorry."  (*Id.*, p. 32).  Defendant asked when this happened, and Plaintiff responded that he did not remember, but added that it did not happen often, only "[o]nce in a while."  (*Id.*, p. 30).  Plaintiff further stated, "That's the only closest thing I can get to her, but I know it's not right."  (*Id.*).  When Defendant pushed Plaintiff further on I.T.'s claim that he had touched her groin area, Plaintiff claimed that he never touched her in the groin area and stated: "Nothing like that . . . because basically, I don't have time for that, first of all.  Second it's against my own rules.  Against my own, you know, reputation.  My sister is – leaving her with me and she's seven – not even seven."  (*Id.*, p. 36).

Defendant then asked Plaintiff: "So, how many times do you think you touched her, where it could have been inappropriate?"  (*Id.*, p. 41).  Despite his previous denials of any inappropriate touching, Plaintiff responded: "A few because basically most of the time, . . . she feels like she needs her father, as well as she sees me as a father figure."  (*Id.*).  Plaintiff stated that: "I don't see it's inappropriate because we pretty much not doing anything and not even grabbing, or rubbing or stuff like that."  (*Id.*, pp. 42–43).

At the end of the interview, Defendant asked Plaintiff about any inappropriate sexual desires towards children, to which Plaintiff responded that he didn't have a girlfriend and stated: "[M]y point is you don't have any action, let's say that, for a while, you have those feelings when pretty much anything moves . . . .  So, if somebody approaching you, you have that feeling like wow this feels so good, so might as well do a little bit of this.  I don't think she would mind.  That's the way I see it."  (*Id.*, pp. 47–48).  Plaintiff repeated his denials about

ever touching I.T. inappropriately, and he denied any sexual interest in or satisfaction from touching her. (*See id.*, pp. 45–47).

According to Defendant, based on the facts and circumstances known at the time, he concluded that there was probable cause to arrest Plaintiff for sexual abuse in the first degree. (Dkt. No. 72-3, ¶ 10). Defendant also decided to contact Delaware County Chief Assistant District Attorney John Hubbard to seek further assurance that probable cause existed. (*Id.*, ¶ 11). According to Defendant:

> I told Hubbard that a child in Margaretville told a social services caseworker about inappropriate touching, and that the child would not speak to me at the school. I told [Hubbard] that the caseworker reported that I.T. said she was touched on more than one occasion in a private area. I also told Hubbard that I interviewed [Plaintiff], who confirmed that inappropriate touching occurred, but stated that the touching was accidental and that he apologized to I.T. Hubbard told me that he believed there was probable cause to arrest [Plaintiff].

(*Id.*; *see also* Dkt. No. 83-7, pp. 12–15, 20). On December 18, 2015, Defendant arrested Plaintiff and filed a felony complaint in Town of Middletown court charging him with sexual abuse in the first degree. (Dkt. No. 85, ¶ 46; Dkt. No. 72-12). Approximately five to six hours later, Plaintiff was released on bail, and the court ordered that Plaintiff stay away from I.T., her mother, and her brother. (Dkt. No. 72-9, pp. 3–6; Dkt. No. 85, ¶¶ 47–48).

Plaintiff was arraigned on December 23, 2015, and he appeared in town court on January 27, 2016 and April 13, 2016 for his felony hearing. (Dkt. No. 85, ¶¶ 49–50). On September 21, 2016, the case was dismissed. (*Id.*, ¶ 50). According to Chief ADA Hubbard, his office declined to proceed with the case because I.T.'s mother was "very uncooperative," and told Hubbard that she did not want the case prosecuted. (Dkt. No. 83-7, p. 62). Under

those circumstances, Hubbard decided not to subpoena I.T. because he "wasn't going to put a six-year-old through a preliminary hearing." (*Id.*).

On March 17, 2017, Plaintiff filed the instant action in state court against numerous parties, including Defendant, for alleged illegal seizure, false arrest, and malicious prosecution. (Dkt. No. 3). The case was removed to this Court on April 4, 2017. (Dkt. No. 1).

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

Following the Court's Order on the Defendants' motion to dismiss, there are two remaining causes of action against Defendant: (1) false arrest; and (2) malicious prosecution.[2] (*See* Dkt. No. 36). In moving for summary judgment, Defendant argues that: (1) Plaintiff's claims fail because Defendant had probable cause to arrest and initiate the prosecution; and (2) Defendant is otherwise entitled to qualified immunity because there was at least arguable probable cause. (*See generally* Dkt. No. 72-1). The Court will assess each claim in turn.

---

[2] Plaintiff asserts his claims of false arrest and malicious prosecution under both state and federal law. (*See* Dkt. No. 41).

## A. False Arrest

Defendant argues that Plaintiff's false arrest claim must fail because Defendant had probable cause to arrest him based on the totality of the circumstances at the time.  (Dkt. No. 72-1, pp. 9–14).  In response, Plaintiff contends that there are issues of fact which preclude a finding of probable cause.  (Dkt. No. 79, p. 13).

### 1. Applicable Law

When evaluating Section 1983 claims of false arrest, courts "'generally look[ ] to the law of the state in which the arrest occurred.'"  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)).  In New York, a claim for false arrest requires the plaintiff to show that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[;] and (4) the confinement was not otherwise privileged."  *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)).

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity."  *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).  As to probable cause, a police officer "has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015).  In the context of summary judgment, "where there is no dispute as to what facts were relied on to demonstrate

probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F. 3d 139, 157 (2d Cir. 2007) (citation omitted).

A court examines each piece of evidence and considers its probative value, and then looks to the totality of the circumstances to evaluate whether there was probable cause to arrest. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quotation marks omitted). The existence of probable cause at the time of arrest is a complete defense to a claim for false arrest. *Torraco v. Port Auth. of New York and New Jersey*, 615 F.3d 129, 139 (2d Cir. 2010) (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)). An officer typically has probable cause to arrest "if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993). However, an officer may not rely on such statements if there are "circumstances that raise doubts as to the victim's veracity." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) (quotation omitted).

### 2. **Arguments**

Defendant contends that probable cause was supported by three categories of evidence: (1) I.T.'s statements to Cumpston; (2) Plaintiff's statements to State Police; and (3) communication between State Police and Chief ADA Hubbard. (Dkt. No. 72-1, pp. 9–14). Specifically, Defendant asserts that I.T.'s statements supported probable cause because I.T. claimed that Plaintiff had touched her inappropriately more than one time, and that she told Plaintiff to stop touching her. (*Id.*, pp. 10–11). Defendant further claims that Plaintiff's statements to Defendant also support probable cause because Plaintiff confirmed that he touched I.T. inappropriately and that I.T. told him not to touch her. (*Id.*, p. 12). According to

Defendant, Plaintiff's apparent backtracking and minimization of his conduct "would lead any reasonable officer to conclude that I.T. was telling the truth and that [there was] probable cause to arrest." (*Id.*). Finally, Defendant points to his consultation with Chief ADA Hubbard, who, after weighing all of the information that Defendant had collected, also concluded that there was probable cause to arrest. (*Id.*, pp. 13–14). Defendant adds that Plaintiff's focus on alleged deficiencies in Cumpston's interview with I.T. is misplaced because probable cause depends on the totality of the circumstances. (Dkt. No. 84, p. 2).

In response, Plaintiff claims that Defendant's reliance on Cumpston's interview was improper because Cumpston was "untrained in forensic interviewing," and "made no inquiry as to whether the touching involved 'sexual gratification' . . . ." (Dkt. No. 79, p. 13). Plaintiff asserts that Defendant erred by relying on Cumpston's "unreliable" interview, and by otherwise failing to corroborate Cumpston's findings through his own interview. (*Id.*, p. 14). Moreover, Plaintiff asserts that Defendant erred by disregarding his training, "which required him to determine a bilingual child's primary language at home and the need for an interpreter no matter how well I.T. spoke English at school." (*Id.*). Plaintiff claims that these alleged deficiencies during I.T.'s interviews with investigators "create genuine factual and material issues of reliability and credibility which must be determined by the trier of fact." (*Id.*, p. 17).

Further, Plaintiff argues that Defendant improperly relied on Plaintiff's statements to police because "Defendant cherry-picks sentences out of the video transcript [from Plaintiff's interview] to inculpate [Plaintiff]." (*Id.*, pp. 18–19). Plaintiff also asserts that Defendant's consultation with ADA Hubbard does not support probable cause because Hubbard "was informed about some of the evidence but not all of the evidence, or lack thereof" and because

Defendant "was going to arrest [Plaintiff] even without speaking with the D.A." (*Id.*, pp. 20–22).

### 3. Analysis

The parties only dispute the fourth element of Plaintiff's false arrest claim, that is, whether his confinement was privileged by probable cause. As relevant here, "a person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact . . . when the other person is less than eleven years old." N.Y. Penal Law § 130.65(3). Sexual contact means "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party." N.Y. Penal Law § 130.00(3). "It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing . . . ." *Id.* Thus, the question is whether Defendant had probable cause, based on the totality of circumstances, to reasonably believe that Plaintiff had subjected I.T. to sexual contact.

Based on the facts available to Defendant at the time, the Court finds that there was probable cause to arrest Plaintiff. The record shows that Defendant's investigation began with a report from DSS caseworker Cumpston that I.T. had made a credible allegation of sexual abuse. (Dkt. No. 72-3, ¶¶ 3–6; *see also* Dkt. No. 72-4, pp. 3–9). Cumpston conducted two separate interviews with I.T., during which I.T. consistently alleged that: (1) Plaintiff touched her "private parts" on multiple occasions; (2) that only I.T. and Plaintiff were home at the time; (3) the touching occurred when she entered Kindergarten; and (4) her uncle was no longer touching her inappropriately. (*See* Dkt. No. 72-4, pp. 4–5, 8–9; *see also* Dkt. No. 83-2, p. 107). I.T. specified that Plaintiff had touched her groin area on the outside of her pants. (Dkt.

No. 72-4, pp. 7–8).  Cumpston then informed Defendant of I.T.'s allegations.  (Dkt. No. 83-2, pp. 112–13).

I.T.'s allegations support a finding of probable cause because her account describes repeated sexual contact by Plaintiff with a six-year-old.  Despite I.T.'s young age, her allegations were specific and consistent across both interviews.  Further, Defendant reported that he found I.T. to be "extremely intelligent and extremely articulate from the conversation [he] had with her."  (Dkt. No. 83-1, p. 83).  Although Plaintiff objects to the interview techniques used by Cumpston, there is no indication that I.T. was induced to allege that Plaintiff touched her inappropriately, or that any language barrier affected her allegations.  (*See generally* Dkt. Nos. 72-4, 83-1, 83-2, 83-8).  Nor does Plaintiff raise any doubts that I.T.'s allegations appeared to be credible.  (*See* Dkt. No. 79, pp. 12–17).  Plaintiff's sexual gratification motive can also be inferred from I.T.'s account.  *See People v. Hayes*, 962 N.Y.S.2d 443, 447 (3d Dep't 2013) (noting that a "defendant's sexual gratification motive can be readily inferred from his conduct in subjecting the young victim to repeated unwanted touching of her intimate parts").  Therefore, the record shows that Defendant reasonably relied on I.T.'s allegations, which supported probable cause to arrest.[3]

---

[3] Rather than attacking the veracity of I.T.'s allegations, Plaintiff primarily argues that the interview techniques that Cumpston employed were improper and contrary to "best practices."  (*See* Dkt. No. 79, pp. 12–17; *see also* Dkt. No. 80).  Specifically, Plaintiff claims that the interviews were critically flawed because Cumpston: (1) was untrained in forensic interviewing, including the use of anatomical dolls; (2) failed to keep contemporaneous notes during the interview, or otherwise inappropriately discarded them; and (3) failed to question I.T. as to whether the touching involved "sexual gratification," thereby failing to preclude permissible alterative reasons for the touching.  (Dkt. No. 79, pp. 13–14).  Plaintiff further claims that Defendant erred by improperly relying on Cumpston's flawed interviews, and otherwise disregarded important aspects of his own forensic interview training, such as: (1) determining a bilingual child's primary language to assess the need for an interpreter; (2) corroborating the abuse allegations through his own interview rather than through a third party's interview; and (3) failing to personally observe any of the interviews where I.T. made statements about the nature of the alleged inappropriate touching.  (*Id.*, pp. 14–17).  Despite these critiques, it is well-established that the failure to follow alleged "best practices" does not vitiate the existence of probable cause under the circumstances here.  *See Panetta*, 460 F.3d at 395–96 (noting that "the fact that an innocent explanation may be consistent with

13

To the extent Plaintiff argues that Defendant improperly relied on Cumpston's interview of I.T., as opposed to conducting his own, it is well-established that officers may rely on social workers and school officials, particularly in sensitive cases where, as here, young children are reluctant to share sensitive information with law enforcement. *See, e.g.*, *Brown v. City of New York*, No. 16-CV-1919, 2018 WL 3821620, at *7, 2018 U.S. Dist. LEXIS 135478, at *19 (S.D.N.Y. Aug. 10, 2018) ("[I]t is undisputed that, at that time, [Detective] Cardona was aware that a school official—a complaining witness—had filed a report of suspected child abuse with NYSOCFS, which was thereafter referred to the NYPD, noting that E.B. had lacerations/bruises/welts as a result of her father pinching her. This establishes probable cause to arrest Mr. Brown for assault in the third degree, among other things."); *Peterson-Hagendorf v. City of New York*, 146 F. Supp. 3d 483, 485–87 (E.D.N.Y. 2015) (dismissing a false arrest claim at summary judgment upon finding of probable cause to arrest a teacher for endangering the welfare of a child based upon the school principal's observation of a welt on the child's neck, as well as interviews of the child by several individuals during which the child consistently described the teacher's physical abuse).

The other piece of evidence available to Defendant was Plaintiff's interview at the police barracks, which was video recorded.[4] During the interview, Plaintiff stated that there

---

the facts alleged does not negate probable cause," and "[a]lthough a better procedure may be for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him"); *see also Hayes v. City of New York*, No. 12-CV-4370, 2014 WL 4626071, at *10–11, 2014 U.S. Dist. LEXIS 92953, at *29–33 (S.D.N.Y. Sept. 15, 2014) (finding no error in the defendant officer's probable cause finding where, despite purportedly inadequate investigation techniques, there was probable cause for the arrest). The Court finds that none of the critiques posed by Plaintiff raise doubts about the veracity of I.T.'s allegations or the *material* facts supporting probable cause.

[4] In considering the interview, the Court has reviewed both the video recording and the written transcript. (*See* Dkt. Nos. 72-3, Ex. 1; 83-6).

were "a few" times when he touched I.T. where it could have been inappropriate. (Dkt. No. 83-6, p. 41). Plaintiff asserts that these statements were "cherry picked" from the transcript, but there is no dispute that he admitted to hugging I.T. and touching her leg, and Plaintiff acknowledged that there was at least one occasion where I.T. told him to stop hugging and touching her. (*Id.*, pp. 28, 30–31, 36). Plaintiff's interview is consistent with I.T.'s account on several important points: (1) the touching occurred more than once; (2) the touching occurred on the couch; (3) the touching could have been considered inappropriate; and (4) that I.T. told Plaintiff to stop touching her. (*Compare* Dkt. No. 72-4, pp. 4–5, 7–8, *with* Dkt. No. 83-6, pp. 29–32, 41–42).

Although Plaintiff claims that any inappropriate touching was accidental, it is well-established that "a suspect's denials are insufficient to obviate probable cause," and "the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 32 (E.D.N.Y. 2015) (citations omitted). Moreover, "[a]n arresting officer thus does not have a 'duty to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." *Yorzinski v. City of New York*, 175 F. Supp. 3d 69, 76 (S.D.N.Y. 2016) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003)). Indeed, Plaintiff's explanation during the interview could be seen as an attempt to minimize and deflect from his wrongdoing. *See Brown*, 2018 WL 3821620, at *8, 2018 U.S. Dist. LEXIS 135478, at *19–20 ("That the Browns or E.B. may have later minimized the pinch as playful 'does not preclude a finding that [the officer] had probable cause' to arrest Mr. Brown, especially in the absence of any reason to doubt the credibility of the unequivocal accounts regarding the interaction and E.B.'s injury.") (citation omitted).

Further, Plaintiff made several statements during the interview that could be fairly interpreted to infer that he touched I.T. for his own sexual gratification.  For example, Plaintiff explained that he did not have a girlfriend, and then, despite denying having any inappropriate sexual interests in I.T., stated that "my point is that [if] you don't have any action . . . for a while, you have those feelings when pretty much anything moves."  (Dkt. No. 83-6, p. 48).  He continued on to say: "So, if somebody [is] approaching you, you have that feeling like wow this feels so good, so might as well do a little bit of this.  I don't think she would mind.  That's the way I see it."  (*Id.*).  Prior to making those comments, Plaintiff had backtracked on whether he had ever touched I.T. inappropriately, ultimately admitting that there were at least "a few" times where his contact with her could be considered inappropriate, and further acknowledging that I.T. told him directly to stop touching her.  (*See generally* Dkt. No. 83-6, pp. 15, 19, 27–32, 35–36, 41–42).  Plaintiff also stated that he understood the law, and noted that he would not have touched I.T. inappropriately because: "I know I'll be in trouble.  A hundred percent in trouble.  I know I can go to the jail and I know I probably be doing fifteen years in jail."  (*Id.*, pp. 24, 39).  Putting aside Plaintiff's self-serving denials, his other statements could reasonably be interpreted in the overall context as suggesting that touching I.T. was sexually motivated, thereby adding to the facts supporting probable cause.

Looking at the totality of the circumstances, there is no dispute as to the facts available to Defendant at the time of Plaintiff's arrest.  I.T.'s allegations describing sexual contact by Plaintiff supported a finding of probable cause to arrest Plaintiff for sexual abuse, and Plaintiff's interview did not change that.  Accordingly, the Court concludes as a matter of law that Defendant had probable cause to arrest Plaintiff for sexual abuse in the first degree.  Therefore, Defendant is entitled to summary judgment on Plaintiff's false arrest claims.  *See*

*Weiner*, 90 F. Supp. 3d at 28–33 (dismissing the plaintiff's false arrest claim on summary judgment where the arresting officers' probable cause determination relied upon abuse allegations from child witnesses); *see also Callahan v. City of New York*, 90 F. Supp. 3d 60, 68–69 (E.D.N.Y. 2015) (dismissing the plaintiff's false arrest claim on summary judgment where the arresting officers had probable cause to arrest the plaintiff for child endangerment); *Donovan v. Briggs*, 250 F. Supp. 2d 242, 250–53 (W.D.N.Y. 2003) (dismissing the plaintiff's false arrest claim where there was probable cause to arrest the plaintiff for sexual abuse, despite questions about the victim's reliability).

### B. Malicious Prosecution

Next, Defendant argues that Plaintiff's malicious prosecution claim fails because the probable cause for Plaintiff's arrest also supported his prosecution. (Dkt. No. 72-1, p. 15). In response, Plaintiff claims that any probable cause supporting the arrest "dissipated" between the date of the arrest and the felony hearing. (Dkt. No. 79, pp. 22–24).

### 1. Applicable Law

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must establish four elements for a malicious prosecution claim: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* (quotations and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017). Because lack of probable cause is an element of

the offense, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Manganiello*, 612 F.3d at 161–62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).

### 2. Arguments

In support of summary judgment, Defendant relies on his previous analysis supporting the arrest, and further asserts that the "probable cause analysis is the same in the false arrest and malicious prosecution contexts where the plaintiff does not allege that there was any difference in the facts known to police officers between arrest and arraignment." (Dkt. No. 72-1, p. 15). Plaintiff counters that probable cause had dissipated because, "by the time of the felony hearing, some four months after [P]laintiff's arrest, [Defendant] was seeking a further interview with I.T. because he needed to 'confirm' the touching, without which he recognized there 'was no case.'" (*Id.*, pp. 23–24). The parties also dispute whether the facts support a finding that Defendant acted with malice in initiating Plaintiff's prosecution. (*See* Dkt. Nos. 72-1, p. 15; 79, pp. 22–24; 84, p. 5).

### 3. Analysis

As discussed above, the facts at the time of Plaintiff's arrest supported a reasonable finding of probable cause for sexual abuse in the first degree. Although Plaintiff suggests that the probable cause dissipated between his arrest and the felony hearing, he does not identify any intervening facts, besides Defendant's wish to conduct another interview with I.T. However, for probable cause to dissipate, "the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Therefore, "the question is whether either the evidence gathered after arrest undermined a

finding of probable cause, or whether the [ ] [d]efendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010).

In this case, Plaintiff points to the transcript from Defendant's testimony at the felony hearing, in which Defendant stated that he felt the prosecution needed to re-confirm I.T.'s statements to move forward. (*See* Dkt. No. 79, pp. 23–24). According to Defendant, he believed that it was necessary for I.T. to re-confirm her earlier abuse allegations for the case to proceed against Plaintiff after his arrest. (Dkt. No. 83-1, pp. 119–22). Regardless of reconfirmation, Defendant still felt there was probable cause because "[I.T.'s] disclosure and certain admissions made by [Plaintiff] forced [investigators] to believe there was sexual conduct, [that] it was for his gratification and the arrest was made." (*Id.*, p. 124).

Significantly, Defendant's opinions on the likely success of the case without reconfirmation had no effect on I.T.'s prior statements, which themselves supported a finding of probable cause. In other words, Defendant's wish to re-confirm I.T.'s allegations does not demonstrate any change in the available evidence regarding Plaintiff's alleged commission of sexual abuse. Thus, Plaintiff has not identified any intervening facts or exculpatory evidence which dissipated or otherwise diminished the probable cause from the time of his arrest. Since there is no evidence of dissipation, the prosecution began with the same facts supporting probable cause from the time of Plaintiff's arrest. Therefore, the Court can conclude as a matter of law that probable cause also supported the prosecution, for the same reasons discussed above. *See Kaskell v. Compagnone*, 664 F. App'x 109, 111–12 (2d Cir. 2016) (affirming the dismissal of a malicious prosecution claim where probable cause for the

plaintiff's arrest for child abuse was supported by allegations from the mother of the victims, the arresting officer's experience, and a pediatrician's report of suspected child abuse); *see also Lanning v. City of Glens Falls*, No. 16-CV-132, 2017 WL 922058, at *4, 2017 U.S. Dist. LEXIS 32878, at *11–12 (N.D.N.Y. Mar. 8, 2017) (rejecting the plaintiff's dissipation theory where there were no new facts learned between the arrest and the arraignment) (citing *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 437 (S.D.N.Y. 2014), *aff'd*, 590 F. App'x 112 (2d Cir. 2015)).

Furthermore, there is no evidence in the record to permit a rational inference that Defendant acted with malice in initiating Plaintiff's prosecution. Defendant's alleged failure to follow best practices, even if true, does not demonstrate that he acted with improper or wrongful motives, nor does it show reckless disregard of Plaintiff's rights. And the record shows that, before arresting Plaintiff, Defendant consulted with Chief ADA Hubbard to confirm his opinion that probable cause existed, which vitiates any possible finding of malice. (Dkt. No. 72-3, ¶ 11). *See Cilauro v. Duff*, No. 06-CV-0498, 2009 WL 2259142, at *3–4, 2009 U.S. Dist. LEXIS 67367, at *9–11 (N.D.N.Y. July 29, 2009) (dismissing the plaintiff's malicious prosecution claim where, among other things, the record contained no evidence that the defendant was motivated by malice); *Rizzo v. Edison, Inc.*, 419 F. Supp. 2d 338, 349 (W.D.N.Y. 2005) (same). Accordingly, Defendant is entitled to summary judgment on Plaintiff's malicious prosecution claims.

### C. Qualified Immunity

In the alternative, Defendant claims that "even if [Defendant] did not have probable cause to arrest the plaintiff, he is entitled to qualified immunity because he had 'arguable probable cause.'" (Dkt. No. 72-1, pp. 15–17). Plaintiff disagrees. (Dkt. No. 84, p. 6).

### 1. Applicable Law

Qualified immunity establishes a defense for a government actor acting in his official capacity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* In the context of false arrest and malicious prosecution claims, an officer is entitled to qualified immunity if he had "arguable probable cause," which means that "officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

### 2. Arguments

Defendant contends that, at a minimum, reasonable officers could disagree as to whether based on all the facts there was probable cause to believe that Plaintiff committed sexual abuse in the first degree. (Dkt. No. 72-1, pp. 15–17). Defendant adds that any failure by him to comply with "best practices" or training, even if true, "do[es] not automatically negate qualified immunity." (Dkt. No. 84, p. 6).

In response, Plaintiff asserts that Defendant "is not entitled to qualified immunity because there are numerous issues of genuine and material fact," including that Defendant: (1) "erroneously relied on Cumpston's interview results when he knew that she was untrained in forensic interviewing"; and (2) "could not reasonable [sic] rely on Cumpston as a 'fellow officer' because she was a DSS caseworker untrained in the work of a Senior Investigator for the State Police, and because [Defendant] was called to the scene by Cumpston specifically to take over the investigation . . . ." (Dkt. No. 79, pp. 24–25). Further, Plaintiff asserts that an officer of reasonable competence could not have made the same choice because "[t]he record

reveals that [Defendant] disregarded the operating NYSP 'methodology' in forensic child interviews contained in his course curriculum," which Plaintiff claims, "creates at least a genuine factual and material issue as to whether any reasonably competent state police forensic interviewer could rely on the information obtained in this case . . . ." (*Id.*, pp. 25–26).

### 3. Analysis

As discussed above, the Court finds as a matter of law that based on the information available to Defendant, probable cause existed to arrest Plaintiff and initiate his prosecution. Necessarily it follows that the information available to Defendant also satisfied the lesser standard for arguable probable cause. Furthermore, the fact that Defendant relied on Cumpston's interview with I.T. does not show that he acted unreasonably, as discussed above. And the fact that Defendant sought the advice of Chief ADA Hubbard, and that Hubbard agreed that there was probable cause to arrest Plaintiff, shows that Defendant's actions were reasonable. *See Strawn v. Holohan*, No. 04-CV-1292, 2008 WL 65586, at *6, 2008 U.S. Dist. LEXIS 618, at *18–19 (N.D.N.Y. Jan. 4, 2008) (finding that the arresting officer's consultation with the district attorney's office prior to the arrest "is a factor supporting the reasonableness of [the officer's] actions"); *see also Dale v. Kelley*, 908 F. Supp. 125, 137–38 (W.D.N.Y. 1995) (noting that police officers must be able to rely on advice of prosecutors and holding that defendant was entitled to qualified immunity where he was "acting at the direction of an Assistant District Attorney"), *aff'd*, 95 F.3d 2 (2d Cir. 1996).

Accordingly, even if the facts available to Defendant fell short of probable cause, there was at least arguable probable cause to arrest Plaintiff for sexual abuse in the first degree and initiate his prosecution. Therefore, Defendant is entitled to qualified immunity on Plaintiff's Section 1983 claims. *See Betts v. Shearman,* 751 F. 3d 78, 83 (2d Cir. 2014) (holding that the

existence of arguable probable cause entitled arresting officers to qualified immunity on the plaintiff's malicious prosecution claim); *see also Donovan*, 250 F. Supp. 2d at 253–60 (holding that the defendants were entitled to qualified immunity where there was at least arguable probable cause to arrest the plaintiff); *Fleurimond v. Holder*, 403 F. Supp. 3d 95, 107–111 (E.D.N.Y. 2019) (same).

## V.     CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 72) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 41) is **DISMISSED with prejudice**; and

**ORDERED** that Plaintiff's request to amend the Amended Complaint is denied as moot; and finally, it is

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   March 31, 2020
         Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge